## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FELDMAN & PINTO, P.C.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 11-cv-5400** |
| | : | |
| **MARTHA LYNN SEITHEL** | : | |
| **and** | : | |
| **SEITHEL LAW, LLC,** | : | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Defendants, Martha Lynn Seithel ("Seithel") and Seithel Law, LLC

("Seithel Law")(hereinafter collectively "Defendants") request the denial of the

imposition of the Preliminary Injunction requested by Plaintiff, Feldman &

Pinto, P.C. ("F&P" or "Plaintiff") and submits the following Findings of Fact and

Conclusions of Law for consideration and adoption by the Court:

### PROPOSED FINDINGS OF FACT

### The Parties

### Martha Lynn Seithel

1.      Martha Lynn Seithel was born and raised in Charleston, South

Carolina [Transcript ("Tr.") 11/2/11 at p. 5].

2.      After graduating from the University of South Carolina in 1993

with a B.A. in Government and International Studies, Ms. Seithel was elected

for three consecutive terms to serve in the South Carolina House of

Representatives [Tr. 11/2/11 at p. 5].

3.      During her term of service in the South Carolina legislature, Ms.

Seithel entered the University of South Carolina School of Law, receiving a Juris Doctor degree in 2001 [Tr. 11/2/11 at p. 5].

4.      Following her law school graduation, Ms. Seithel accepted a clerkship with the Honorable Marc Westbrook of the South Carolina Circuit Court. [Tr. 11/2/11 at p. 5].

5.      In May 2002, Ms. Seithel joined the law firm of Motley Rice, LLC. [Tr. 11/2/11 at p. 6].

6.      Motley Rice is a large national Plaintiff personal injury firm consisting of more than 70 attorneys and 300 support staff that pursues product liability, asbestos and catastrophic injury cases on behalf of its clients. [Tr. 11/2/11 at p. 6].

7.      During her eight and one-half years with Motley Rice, Ms. Seithel focused her professional career and developed a thriving practice in the litigation and management of pharmaceutical tort litigation cases, including those involving the drugs Fenphen, Vioxx, Celebrex, Bextra, Advair, Paxil, Zicam, and others. [Tr. 11/2/11 at pp. 6-7].

8.      Her responsibilities involved every element of pre-litigation activities including but not limited to creating liability and causation packages, locating clients,  and deciding jurisdictional issues, etc., as well as litigation tasks including locating and working with experts, preparing plaintiffs for their depositions, taking the depositions of corporate representatives and treating physicians, preparing discovery motions, preparing responses to and briefing in

opposition to motions for summary judgment, and preparing cases for trial. [Tr. 11/2/11 at pp. 7-9].

9.     While no pharmaceutical-based tort claims ended up going to trial during her service with Motley Rice, Ms. Seithel participated in other trials as second chair and co-counsel. [Tr. 11/2/11 at p. 10].

10.     In one instance, Ms. Seithel tried a small automobile accident case to conclusion as sole lead counsel. [Tr. 11/2/11 at p. 10].

11.     In connection with her service at Motley Rice, Ms. Seithel has remained a member in good standing of the Bar of the State of South Carolina since 2001 and has been admitted to practice in the South Carolina District Court and the Courts of Appeals for the Fourth and Ninth Circuits.  She has been admitted to practice *pro hac vice* in numerous jurisdictions, including the Federal District Courts for the Eastern District of Pennsylvania and District of Arizona, and the state courts in Pennsylvania, New Jersey, California, Texas and Arizona. [Tr. 11/2/11 at p. 12].

12.     In addition, during her tenure at Motley Rice, Ms. Seithel served in leadership positions (chair and co-chair) on numerous Multi-District Litigation (MDL") committees involved in the litigation of several different pharmaceutical tort litigation matters. [Tr. 11/2/11 at pp. 11-12].

13.     Ms. Seithel has never been subjected to any disciplinary actions and has never been denied admission *pro hac vice* in any jurisdiction. [Tr. 11/2/11 at p. 13].

14.     As a result of her experiences at Motley Rice, Ms. Seithel is

comfortable about her ability to try a pharmaceutical tort case to conclusion.
[Tr. 11/2/11 at pp. 10-11].

**Feldman & Pinto, P.C.**

15.    Formed in 1994, Feldman & Pinto, P.C. is a personal injury
practice comprised of five attorneys and ten support staff. [Tr. 10/12/11 at pp.
15-16].

16.    In the last five years, the lawyers of the firm have almost
exclusively engaged in medical malpractice work as well as acting as local or
liaison counsel in pharmaceutical litigation in Philadelphia County. [Tr.
11/2/11 at p. 16]. The firm has not participated in pharmaceutical litigation
on a national level. [Tr. 11/3/11 at p. 30].

17.    No lawyer at F&P has ever tried a pharmaceutical tort case and the
firm has only acted as local or liaison counsel in Philadelphia. In fact, only two
such cases have ever tried to conclusion. [Tr. 10/27/11 at pp. 3-4].

### The Factual Background

18.    Ms. Seithel met Rosemary Pinto, a founder of F&P, in
2009 while in attendance at status conferences related to Paxil Birth Defect
cases that Ms. Seithel was prosecuting on behalf of Motley Rice in the
Philadelphia Court of Common Pleas. [Tr. 11/2/11 at pp. 13-14].

19.    Beginning in the fall of 2009, Ms. Seithel was invited to enter into
discussions with Ms. Pinto and her partner Laura Feldman, regarding their
desire to have Ms. Seithel join their firm at the end of 2009. [Tr. 11/2/11 at pp.
14-17].

20.     F&P wanted to utilize Ms. Seithel's contacts to increase its mass tort pharmaceutical litigation practice and to use Ms. Seithel's experience to broaden relationships with its existing clients and referral attorneys and expand its local counsel business.   In fact, by the Summer of 2010, Ms. Seithel had developed what Laura Feldman had described as "a whole new book of cases" in keeping with the promise of Ms. Seithel's employment. [Tr. 10/12/11 at pp. 28-29].

21.     Ms. Seithel agreed to join F&P in December 2009 and actually became employed with the firm on February 1, 2010 as a partner . [Tr. 11/2/11 at pp. 15-20; Exhibit ("Exh.") D-43].  The terms of that employment arrangement included (a) a salary totaling $250,000 (monthly salary payments of $11,000 and full tax payment coverage), (b) transportation to and from South Carolina, (c) living accommodations in Philadelphia, (d) a sharing of fees received from any pharmaceutical cases that were generated after January 1, 2010 in an amount equal to the firm's named principals, Laura Feldman and Rosemary Pinto, and (e) an office would be maintained for her in South Carolina, including the provision of one staff person. [Tr. 11/2/11 at pp.16-17, Tr. 10/12/11/ at p. 23; Tr. 10/13/11 at pp. 81, 83].  It was further agreed that Ms. Seithel would receive 100% of the fees generated from the Paxil cases referred to the firm as local counsel for the Motley Rice firm. [Tr. 11/2/11 at pp. 38-39]

22.     At the inception of the relationship, Ms. Seithel completed forms for medical coverage and for inclusion on the firm's professional liability policy

designating herself as a "partner" in the firm.  The AETNA health insurance

application was co-signed by the founder and sole shareholder of the firm,

Laura Feldman, to whom she also delivered the malpractice insurance form.

[Tr. 11/2/11 at p.18-21; Exh. D-43].

     23.    Additionally, in the fall of 2010, Ms. Seithel was admitted *pro hac*

*vice* in tort-based Paxil litigation pending in the United States District Court for

the Eastern District of Pennsylvania  pursuant to an application executed by

Ms. Pinto as a "partner" in F&P,  truthfully proclaiming and representing Ms.

Seithel's expertise in products liability work and Paxil litigation as "national

counsel" with "primary responsibility of all aspects of the prosecution of such

cases, including the depositions of plaintiffs and all fact witnesses, retention of

plaintiffs' experts in the Paxil litigation, prosecution of GSK's company

witnesses in depositions and the resolution of trial set cases."  Ms. Seithel was

further recognized as a "partner" of the firm in that sworn document filed with

the federal court upon penalty of perjury.  [Tr. 11/2/11 at pp. 29-35; Exhs. D-

40 and D-41].  On the basis of that filing, Ms. Seithel was admitted to practice

in connection with the continued prosecution of the case.  [Tr. 11/2/11 at p.

35; Exh. D-42].  Ms. Seithel was also referred to as a "partner" in the firm in

correspondence sent by Laura Feldman to referring counsel Charles Glackin

[Tr. 11/2/11 at pp. 43-46].

     24.    At no time during her employment with F&P did Ms.

Seithel sign any type of agreement restricting her ability to work in competition

with the Firm after her employment with the Firm ended.  In fact, such

restrictions are in direct violation of Rule 5.6 of the Pennsylvania Code of Professional Responsibility and Ms. Seithel had a recognized right to compete with her former employer regarding the representation of clients. [Tr. 10/12/11 at p. 66].

25.     When she first arrived at F&P in February 2010, the firm was only acting as local counsel for other attorneys whose clients were bringing claims arising from the drugs Paxil, Yaz and Advair. The remainder of the firm's caseload was comprised of medical malpractice and other individual personal injury matters. [Tr. 11/2/11 at pp.24-25]. Prior to January 2010, the Firm had not handled any Avandia cases. [Tr. 10/12/11 at p. 21].

26.     Upon assuming her position at F&P, Ms. Seithel immediately took primary responsibility for and day-to-day responsibility of individual Yaz cases in the office, set up a master spread sheet for case management, developed an expense reporting system and forms, successfully used her contacts in the industry to expand the firm's local counsel practice and get the firm involved in several other pharmaceutical mass tort litigations, and set up national meetings in the Yaz and Reglan litigations. [Tr. 11/2/11 at pp. 23-24].

27.     In addition, Ms. Seithel originated the referral of 300-400 Avandia-based cases to the firm for which she also assumed case handling responsibility. [Tr. 11/2/11 at pp. 25-28; Tr. 10/26/11 at p.98; Tr. 10/12/11 at pp. 28-29; Exh. D-46].

28.     In carrying out her responsibilities as a case handling attorney, Ms. Seithel worked with a litigation team made up of attorneys (Ms. Seithel and

Ms. Pinto), a paralegal (Bouyeh Zulu) and occasionally a part-time nurse who helped with case chronologies. [Tr. 11/2/11 at pp. 27-28 and 43; Tr. 10/26/11 at pp. 97].

29.    This "team" approach to litigation was heralded on the firm's website. [Tr. 11/2/11 at p. 29].

30.    In the context of addressing clients of the firm involved in Avandia litigation, Paralegal Bouyeh Zulu consistently referred to Ms. Seithel as the attorney responsible for the handling of their cases. [Tr. 10/26/11 at pp. 94-95, 106, 109, 127-128; D-8].

31.    In October 2010, based upon her generation of new business, Ms. Seithel and F&P agreed to a change in her compensation whereby, beginning January 1, 2011, Ms. Seithel's salary would be doubled to $500,000 per year and the firm's revenues, including fees generated from medical malpractice and personal injury cases, would be split among Ms. Feldman, Ms. Pinto and Ms. Seithel. [Tr. 10/12/11 at pp. 28-29; Tr. 10/13/11 at pp. 92-93; Tr. 11/2/11 at p. 39]. It was further agreed that Ms. Seithel would register the entity with the South Carolina Bar as Feldman, Pinto, Seithel. [Tr. 11/2/11 at p. 40].

32.    At no time during her employment did Ms. Seithel ever receive any email, memorandum or other writing criticizing her performance. [Tr. 10/13/11 at pp. 85, 87; Tr. 11/2/11 at p. 50]

33.    In May 2011, Ms. Feldman and Ms. Pinto informed Ms. Seithel that they no longer wanted to try cases and were only interested in expanding their local counsel practice. [Tr. 11/2/11 at p. 49].

34.    The three attorneys discussed "splitting up the firm" [Tr. 10/13/11 at pp. 98-99]. They also discussed Ms. Seithel starting her own firm and dividing the cases currently handled by the firm so that individual mass tort pharmaceutical cases would go to Ms. Seithel and her new firm and the bulk of the local counsel work would remain with F&P.  It was further agreed that the parties would continue to work together and continue discussions regarding ongoing responsibility for the handling of pending matters.  [Tr. 11/21/11 at pp. 52-54; Exh. D-35; Tr. 10/14/11 at pp. 132,133, and 136].

35.    Throughout these discussions, Ms. Seithel continued to carry out her responsibilities for handling mass tort matters, including directing Paralegal Assistant Bouyeh Zulu to save all records received from referring counsel to be saved in the individual client files.  Tr. 11/2/11 at pp. 51-53; Exh. D-47].

36.    At no time during her tenure with F&P did Ms. Seithel delete or permanently remove any client files or information.  [Tr.11/2/11 at pp. 53-54].

37.    In furtherance of her discussions with Ms. Feldman and Ms. Pinto, Ms. Seithel retained ethics and business counsel to assist her with the setting up of a new practice, secured a federal tax identification number for the new entity (Seithel Law LLC) and registered a domain name with GoDaddy.com. These actions were left open for Laura Feldman to observe and Ms. Seithel discussed things she was "doing to get ready" with Ms. Feldman. [Tr. 11/2/11 at pp. 56-57].

38.   Ms. Seithel did not establish a website, solicit cases or take any action inconsistent with her ongoing employment with F&P. [Tr. 11/2/11 at pp.55-56; Exh. D-48].

39.   During the week of June 6, 2011, Ms. Seithel, Ms. Feldman and Ms. Pinto exchanged e-mail correspondence regarding a formal proposal concerning the splitting of the practice, during which Ms. Feldman referred consistently to the actions necessary to "wrap up our separation and joint work." [Tr. 11/2/11 at pp. 58-64; Exh. P-18; Exh. D-35].

40.   At no time during the email exchanges did Laura Feldman indicate that the suggestions made by Ms. Seithel were extreme or absurd, but only expressed specific inquiries regarding the proposals made by Ms. Seithel. [Exh. 35].

41.   Despite these ongoing discussions, on June 13, 2011 at 9:45 a.m., Ms. Seithel learned from a Texas attorney with whom she was working on a Reglan case that F&P had told him Ms. Seithel no longer worked at the Firm. Ms. Seithel promptly called the firm and Laura Feldman confirmed the fact of her discharge from employment with F&P during a telephone conversation with Ms. Seithel at approximately 10:30 that morning, advising Ms. Seithel that her employment with F&P was terminated and they were immediately cutting off all compensation and benefits. [Tr. 11/2/11 at pp. 69-70].

42.   The singular explanation given for that action was Ms. Feldman's alleged inability to get into an online server known as "Dropbox" into which referring counsel had deposited certain client medical records for review by Ms.

Seithel in connection with the handling of client litigation. [Tr. 11/2/11 at p.70; Exh. P-1].

43. Others at the firm had full access to and/or were invited to have full access to the "Dropbox" server utilized by referring counsel to send large amounts of documents for review by Ms. Seithel in connection with her responsibilities as the handling attorney, including Paralegal Assistant Bouyeh Zulu, Laura Feldman and Rosemary Pinto. [Tr.11/2/11 at pp.71-73; Exh.D-37].

44. All documentation that was transmitted through the Dropbox server was required to be filed into the individual client files maintained on the Feldman and Pinto server. This was the responsibility of Bouyeh Zulu. [Tr. 11/2/11 at p. 71].

45. At no time did Ms. Seithel block access of F&P personnel or its principals to any information contained in the Dropbox server. [Tr.11/2/11 at p. 76].

46. On the same day that she was notified that she was fired, F&P filed the instant law suit in the Philadelphia Court of Common Pleas by Writ of Summons. [Tr. 11/2/11 at pp. 76-77]

47. Following her discharge from employment with F&P (confirmed by letter dated June 15, 2011 [Tr. 11/2/11 at pp. 74-75; Exh. P-1], Ms. Seithel also promptly informed referring counsel with whom she had worked while with the Firm and many of whom she had brought into the Firm, of her change of status and intention to continue in the practice of pharmaceutical mass tort

litigation as Seithel Law LLC. Many of those attorneys agreed to continue working with her and not F&P. [Tr. 11/2/11 at pp. 77-80].

48.    For instance, referring counsel Tor Hoermann issued a letter to Laura Feldman directing that his referred cases be transferred to Lynn Seithel stating that "we have worked only with Lynn on these cases and she is very familiar with the facts of the cases and has put in substantial time preparing them for negotiation."  [Exhibit D-32],

49.    Acting upon the advice of counsel,  on July 7, 9 and 12, Ms. Seithel sent notification letters to approximately 450 clients whose cases she was handling when she left, informing them that she had left the firm, was practicing law from her offices in South Carolina and provided them with the advice that they had the right to chose their legal representative in connection with the ongoing prosecution of their claims; i.e. her firm, Seithel Law LLC, Feldman & Pinto or any other attorney of their choosing.  In the body of the letter, Ms. Seithel provided the full telephone contact information for her law firm, as well as F&P and referring counsel (if any) directing the client to call any of those entities if they had any question and attached a form that would permit the client to choose to join her at her new firm, F&P or any other attorney for continued representation in their case. Copies of those letters were promptly sent to F&P and received by the Plaintiff law firm on July 15, 2011. [Tr. 10/12/11 at pp. 55-56; Tr. 11/2/11 at pp. 80-91; Exh. P-5].  Prior to the dates that Ms. Seithel sent those letters, the Firm had not taken any steps to

notify clients of her departure [Tr. 10/13/11 at p. 114; Tr. 10/14/11 at pp. 28, 36] and clients were not aware that Ms. Seithel left.  [Tr. 10/13/11 at p. 116].

50.    The statement and representations made in the letter to the clients were accurate, true and not misleading in any way.  [Tr. 11/2/11 at pp. 84-91, 113-121, 139].  Moreover, Ms. Seithel was not advised by any client or referring attorney that they believed her letter to be misleading.  [Tr. 11/2/11 at pp. 85-86, 90] and no language in the letter was calculated to persuade the client to make a specific choice over any other.  [Tr. 11/2/11 at pp. 90-91].

51.    Not all of the clients who were sent letters by Ms. Seithel returned the election form making an affirmative choice of counsel.  [Tr. 11/2/11 at p. 91; Exhibit P-6].  Of those that did return the election form to Ms. Seithel, some chose Seithel Law LLC (145), some F&P (19) and some other attorneys. [Tr. 11/2/11 at pp.91-92; Exhs. P-6, 7A].

52.    If the client elected to be represented by F&P or another attorney, Ms. Seithel initiated no further contact with the client.  [Tr. 11/2/11 at p.93]

53.    The election forms received by Ms. Seithel from the clients were sent upon their receipt to F&P. [Tr. 11/2/11 at p. 92].

54.    In addition to being truthful, the letters sent by Ms. Seithel to her clients were made in full compliance with the Pennsylvania Rules of Professional Conduct and controlling Pennsylvania law regarding the rights and obligations of lawyers departing a law firm and communicating with clients as well as in compliance with the Joint Formal Opinion of the Pennsylvania Bar Legal Ethics and Professional Guidance Committees and the Philadelphia Bar

Associations Professional Guidance Committee issued in June 2007, the latter document being described by Plaintiff's expert as "the most comprehensive guidance provided" on the subject of a departing lawyer (Tr. 10/26/11 at p.162).

55.    Upon careful review of the letters sent to clients [Exh. P-5], expert witness Samuel Stretton opined that the letters were consistent with the Rules of Professional Conduct governing the practice of law in Pennsylvania regarding a lawyer departing a law firm and advising clients of that departure.  More specifically, Mr. Stretton testified that: it was neither improper nor misleading to include the experience of a paralegal in advising clients that a litigation team had 20 years of experience in litigating cases where the attorney had more than 10 years of experience; it was not improper to advise clients that the departing attorney had a leadership position in Avandia litigation when the attorney had served for many years on national plaintiffs' committees dealing with federal multi-district litigation matters;  it was not improper for Ms. Seithel to opine that she was "well-suited" to complete the work on their cases;  the provision of choices that the client had for selection of counsel did not deviate from the governing rules and guidances and, in fact, was a model letter that could be used in giving advice to lawyers in the context of Continuing Legal Education Seminars; and the consent form attached to the letter comports with the guidance given by the Pennsylvania courts on the subject.  [Tr. 11/2/11 at pp. 113-121, 139].

56.    On or about August 22, 2011, Bradley McDermott, Esquire, an employee/associate attorney with F&P, telephoned clients who had been referred by the Napoli Bern law firm and initially returned an election form choosing to be represented by Seithel Law LLC, asserting that the statements made in Ms. Seithel's letter to them was misleading because: she only had 10 years experience and not 20; she had been fired from and had not just "left" her employment with F&P (without explaining further why she was terminated); she was not admitted to practice in Pennsylvania ; and she did not have a leadership role in the Philadelphia Avandia litigation and she was not the lead attorney on their case, but that Rosemary Pinto was, in fact, the liaison counsel for the entire mass tort group of Avandia litigation in Philadelphia.  He did not advise them that Ms. Seithel had been admitted to practice numerous times *pro hac vice* in the Philadelphia Court of Common Pleas or that she could hire local counsel so as to permit her to fully represent their interests; and that Ms. Seithel had 10 years of experience prosecuting Pharmaceutical mass tort claims on a national basis for Motley Rice.  [Tr. 10/27/11 at 151-170; Exh. D-31].

57.    Following his phone calls to these clients, he sent letters to those same clients confirming that they had advised him during the telephone calls that they had changed their minds regarding the ongoing representation by Lynn Seithel, again advising that Ms. Seithel's representations in her original letter to them were false and misleading and asking them to acknowledge at the bottom of the letter that they decided to chose F&P for continued

representation without providing a choice in that regard.   His letter did not provide further contact information for Ms. Seithel or further confirm that the client's had a choice regarding who they wanted to represent them.

58.   The information imparted to clients by Bradley McDermott, Esquire on behalf of F&P was intentionally untruthful, incomplete and misleading and intended solely to persuade clients to reverse a freely made election more than one month after they had returned election forms choosing Seithel Law LLC and Lynn Seithel to represent them going forward.

59.   Moreover, as testified to by Plaintiff's expert witness, Thomas Wilkinson, Esquire, the applicable guidance issued jointly by the Pennsylvania and Philadelphia Bar Committees in June 2007 [Exh. P-24], required that F&P respond to the departing attorney's letter fairly, promptly and reiterate the choice that the client had in choosing his or her attorney. [Tr. 10/26/11 at p. 201-5, 206;  Exh. P-24].   Contrary to these requirements, the oral communications and confirming letters sent by Mr. McDermott on August 22, 2011, nearly six weeks after F&P received the letters that Ms. Seithel had sent to clients, were neither timely (and therefore in violation of the Rules of Professional Conduct, Rule 4.2 and 7.3) and improperly disparaging. [Tr. 11/2/11 at pp. 121-127].

60.   In early August 2011, at the direction of F&P principal Laura Feldman, Paralegal Assistant Bouyeh Zulu called clients who had elected Lynn Seithel and Seithel Law LLC as their representative going forward and provided information in accordance with a script she was given by Rosemary Pinto,

advising those clients that "Lynn Seithel was a disgruntled employee who was fired from Feldman & Pinto and was seeking to gain clients for her own advantage, and had never tried a case and was not licensed in Pennsylvania" and distributed that script over her signature with a request for information on an Avandia litigation fact sheet to all Avandia clients. [Tr. 10/26/11 at pp. 110-120; Exh. P-13]. Ms. Zulu further urged the clients to disregard the letter sent by Ms. Seithel [Exh. P-13].

61.   Despite her representations to the client, Ms. Zulu was not personally aware that Ms. Seithel had been fired nor had any knowledge that Ms. Seithel "was merely assisting the partners of this firm who have solidified the Avandia settlement deal" (or even what the Avandia deal was). [Tr. 10/26/11 at pp.120-121].

62.   The information imparted to clients by Paralegal Assistant Bouyeh Zulu at the direction of Laura Feldman and Rosemary Pinto acting on behalf of F&P was intentionally untruthful, incomplete and misleading and intended solely and improperly to persuade clients not to make a free election regarding their legal representation more than one month after they had returned election forms choosing Seithel Law LLC and Lynn Seithel to represent them going forward.

63.   The record is devoid of any proof that any client was misled by the letters sent by Ms. Seithel on July 7. 9. and 12. Moreover, none of the three clients deposed stated that they were confused or misled by any of the statements made in the letters received by Ms. Seithel: Thomas Payne only

repeatedly complained that F&P should have been listed first on the client election form [Exh. P-14 at pp. 11, 15, 17-18, 93]; Van Bailey only changed his mind after he was contacted by Bouyeh Zulu and was provided the information scripted by Ms. Pinto [Exh. P-15 at pp. 25, 28], and was not confused by the content of Ms. Seithel's letter [Exh. P-15 at p. 36]; and Gloria Craycraft stated that the number of years experience in trying cases would not have made a difference in her decision [Exh. P-30 at p. 19], nor would the fact that Ms. Seithel was not admitted in Pennsylvania had made a difference. [Exh. P-30 at pp. 21-22, 25].

## CONCLUSIONS OF LAW

1.  Preliminary Injunctions are extraordinary and drastic remedies. *Sovereign Order of Saint John of Jerusalem-Knights of Malta v. Messineo*, 572 F. Supp. 983, 988 (E.D. Pa. 1983).

2.  The power to issue an injunction should be used sparingly and relief should not be granted except in rare instances in which the law, the facts and the equities are clearly in favor of the moving parties. *Id.* (*citing Wright and Miller*, Federal Practice and Procedure §2948 at 428-29 (1973)).

3.  In order to obtain a Preliminary Injunction under Pennsylvania law, the moving party must establish: (1) A clear right to relief and a likelihood of success on the merits; (2) An injunction is necessary to prevent immediate and irreparable harm which could not be compensated by damages; (3) Greater injury would result by refusing the injunction than by granting it; (4) The injunction would properly restore the parties to their status as it existed

immediately prior to the alleged wrongful conduct; (5) The injunction is reasonably suited to abate the offending activity; and (6) That a preliminary injunction will not adversely affect the public interest. *Warehime v. Warehime,* 860 A.2d 41, 46-47 (Pa 2004). *See also Greater Nanticoke Area Educ. Ass'n,* 938 A.2d at 1183-84; *Kessler v. Broder,* 851 A.2d 944, 947 (Pa. Super. 2004), *appeal denied,* 582 Pa. 676, 868 A.2d 1201 (2005). *See generally Doeblers EA Hybrids, Inc. v. Doebler Seeds, LLC,* 88 Fed. Appx. 520, 522 (3d Cir. 2004).

4.    An injunction should only be issued if the moving party produces evidence sufficient to show that the balance of the above factors favors preliminary relief. *Merchant and Evans, Inc. v. Roosevelt Bldg. Co., Inc.,* 963 F.2d 628, 632 (3d Cir. 1992) (*questioned* on other grounds in *Duraco Prods v. Joy Plastic Enters,* 40 F.3d 1431 (3d Cir. 1994)).

5.    These requisite elements "are cumulative, and if one element is lacking, relief may not be granted." *Norristown Mun. Waste Auth. v. West Norriton Twp. Mun. Auth., 705 A.2d 509, 512 (Pa.Commw.1998).*

6.    Instantly, Plaintiff failed to produce evidence sufficient to meet the heavy burden required to justify the entry of a Preliminary Injunction.

### Plaintiff Has Not Demonstrated A Likelihood Of Success On The Merits Of Its Claims

7.    Plaintiff's Motion for Injunctive Relief is based upon its claim that Defendants tortiously interfered with its existing contractual relations. *See Memorandum of Law in Support Of Plaintiff's Motion for Preliminary and Special Injunction,* pp 9-12.

8.     To establish a cause of action for intentional interference with existing contractual relations, Plaintiff must establish that: (1) there is an existing contractual relationship between plaintiff and a third-party; (2) the defendant[s] intentionally and improperly interfered with the performance of that contract by inducing a breach or otherwise causing the third-party not to perform; (3) the absence of privilege or justification; and (4) plaintiff sustained pecuniary harm as a result of the breach of contract. *Al Hamilton Contracting Co. v. Cowder,* 644 A.2d 188, 191 (1994). *See also Windsor Securities, Inc. v. Hartford Life Insurance Company,* 986 F.2d 655, 659-660 (3d Cir. 1993); *Binns v. Flaster Greenberg, P.C.,* 480 F. Supp.2d 773, 778 (E.D. Pa. 2007). *See generally* Restatement (Second) of Torts § 766.

9.     For purposes of this analysis, "proper conduct" has been defined as "socially acceptable" conduct that society accepts as part of the "rules of the game." *Binns,* 480 F. Supp.2d at 779. (*quoting Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 393 A.2d 1175 (Pa. 1978)).

10.     Unless the conduct is unlawful, deceitful, in violation of professional conduct standards, or a misrepresentation, the conduct will not be considered wrongful or improper. *Triffin v. Janssen,* 626 A.2d 571, 574 (Pa. Super 1993).

11.     In determining whether the conduct is improper, "Pennsylvania courts consider the factors enumerated in the Restatement (Second) of Torts § 767:(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the one with which the actor's conduct interferes; (d) the interests sought to

be advanced by the actor; (e) the proximity or remoteness of the actor's conduct to interference; and (f) the relationship between the parties." (*citing Adler Barish,* 393 A.2d at 1184).

12.    Instantly, the nature of Defendant Seithel's conduct and her motives in writing a truthful letter to clients whose cases she handled or held a principal role in the delivery of legal services was in accordance with the acceptable standards of professional conduct expected of departing lawyers in Pennsylvania and Plaintiff's has not established that Ms. Seithel's conduct was improper, unlawful or otherwise deceitful.

13.    Specifically,   as established in the Joint Opinion authored by Plaintiff's expert witness, Thomas Wilkinson, regarding Ethical Obligations When A Lawyer Changes Firms (hereinafter "Joint Opinion"), a departing lawyer such as Ms. Seithel, has "an independent ethical obligation[] to inform the client that its lawyer is leaving the old firm."   Joint Opinion, at pp. 3-4 (*citing* ABA Formal Opinion No. 99-414).

14.    The departing lawyer's duty to communicate extends only to "...those clients for whom the lawyer either (1) is **currently responsible for handling active matters <u>or</u>** (2) **plays a principal role in the current delivery of legal services**.  In short, current clients are the clients affected by the departure and, hence, the ones to whom the duty to communicate is owed." Joint Opinion, at p. 5 (emphasis supplied).

15.    With respect to the substance of the communication, the Joint Opinion directs that the initial notification should contain the following:

a. The client should be advised of the departing lawyer's intended departure and timing of that intended departure, together with the departing lawyer's new association and willingness and ability of the departing lawyer at the new firm to continue with the current representations of the client;

b. The client should not be urged to sever or continue its relationship with the old firm or to establish a relationship with the new firm;

c. The client should be advised that it has the sole right to decide who will complete or continue the matters, the departing lawyer, the old firm or a new lawyer altogether; and

d. Neither the departing lawyer not the old firm should be disparaged. Joint Opinion, p. 8.

16.     After the lawyer departs, it is well settled that the lawyer is ethically free to solicit clients of the former firm as long as the communication does not contain a false or misleading statement regarding the lawyer's services. Joint Opinion, p. 9.

17.     In the present matter, the evidence establishes that Ms. Seithel's letters were limited to the clients whose cases she was handling while at F&P such that those clients would be affected by her departure.

18.     The substance of Ms. Seithel's letters complied with the requisite standards and fairly gave the clients the option to choose the lawyer that he or she wanted to represent him or her for the remainder of the case.

19.     The letters did not attempt to influence the client decisions in any manner.

20.     Additionally, unlike the disparaging letters sent by F&P, Ms. Seithel's letters did not contain any statements to disparage F&P.

21.     Further, Ms. Seithel's testimony regarding her qualifications and the customary practices established in mass pharmaceutical litigation confirm

that the letters did not contain false or misleading statements. Specifically, paralegals are part of the pharmaceutical litigation "team" and Ms. Seithel's team, including her paralegal assistant collectively had over twenty years experience in handling these claims.

22.     Moreover, the majority of clients who were issued letters were also represented by referring counsel who were copied on the letters and were aware of Ms. Seithel's qualifications.

23.     Accordingly, Ms. Seithel's conduct was not improper.

23.     Based on the foregoing, Ms. Seithel's conduct was also justified under the governing professional conduct standards.  *See generally* Joint Opinion.

24.     Although F&P alleges (but never proved) that Defendants' actions were improperly motivated by an interest in obtaining a fee and building her practice, this court in *Binns* recognized that: "A lawyer's purpose in advising a client is not improper simply because the lawyer seeks additional fees or an enhanced reputation. *Binns*, 480 F. Supp. at 779 n.7 (*citing Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir.1982) (attorney not liable for inducing client to breach contract simply because attorney acted with "mixed motives" and stood to benefit by advising client to commit breach)).

25.     Further evidencing that Defendants did not act improperly, the evidence confirms that Ms. Seithel did not send letters to any clients or referring attorneys until after Plaintiff had completely severed the employment relationship with her.

26.    Additionally, the evidence produced during the hearing establishes that Ms. Seithel's conduct was entirely distinguishable from cases where courts have recognized a claim for tortious interference with contractual relations. *See Joseph D. Shein, P.C. v. Myers*, 576 A.2d 985 (Pa. Super. 1990)(while technically still employed, the departing attorneys unlawfully removed files from the plaintiff law firm's offices and sent grossly misleading letters to the clients whose files they had taken).

27.    More specifically, Ms. Seithel did not send any letters until her employment was terminated and did not unlawfully remove files from the Plaintiff's office.

28.    While Plaintiff claims it could not access files contained in a drop box, the evidence confirms that this information was accessible and the inability of F&P to obtain this information was a result of its principals' capacity to operate a computer program and their voluntary refusal to accept invitations to the drop box in order to obtain the information. Additionally, no evidence was produced by F&P that that the complete files of any client did not remain intact at the firm.

29.    Last, Plaintiff cannot prevail on its tortious interference claim because Ms. Seithel's letter is truthful.  In fact, while Plaintiff alleged that the letters were misleading, Plaintiff does not assert, or did it demonstrate, that the letters are untruthful in any respect.

30.    In the recent case of *Walnut Street Associates v. Brokerage Concepts*, 20 A.3d 468 (Pa. 2011), the Pennsylvania Supreme Court held that

truth is a complete defense to a claim of tortious interference brought pursuant to Pennsylvania law.

31.     Accordingly, because the substance of Ms. Seithel's letters was truthful, she would nonetheless be exonerated from any alleged wrongdoing.

### Plaintiff Has Not Established That It Will Suffer Irreparable Injury Absent Relief

32.     It is well settled in the Third Circuit that "a clear showing of immediate irreparable injury" is necessary to justify the entry of a preliminary injunction. *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir. 1976).

33.     An injunction may not be used to eliminate the possibility of a remote future injury, or a future invasion of rights.  Rather, there must be a "presently existing actual threat of irreparable injury." *Holiday Inns of America, Inc. v. B&B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969).

34.     Irreparable harm is defined as that harm which ". . . cannot be redressed by a legal or an equitable remedy following a trial.  The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (internal citations omitted).

35.     The "...Third Circuit has continually noted that where the claimed injury actually constitutes a loss of money, the loss is capable of recoupment in an action at law." *Greene v. Robert Rubin*, Civ. A. No. 95-2415, 1998 U.S. Dist. LEXIS 227 **3-4 (E.D. Pa. January 15, 1998) (*quoting Naccaratti v. Wilkins Township*, 846 F. Supp. 405, 409 (W.D. Pa. 1993)).

36.   In other words, "the availability of adequate monetary damages belies the claim of irreparable injury." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).

38.   In *Sampson v. Murray*, 415 U.S. 61, 90 (1974), the United States Supreme Court held that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.

39.   Accordingly, the *Sampson* Court held that, even assuming the plaintiff "made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged . . . . we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction." *Sampson, 415* U.S. at 91-92.

40.   In the present matter, Plaintiff has not satisfied its heavy burden in establishing that immediate and irreparable harm will result absent a preliminary injunction that cannot be compensated by damages.

41.   Specifically, the evidence establishes that Ms. Seithel is a highly qualified attorney who is more than capable of handling the matters of those clients who have elected to have Ms. Seithel and Seithel law represent them.

42.   The evidence also establishes that Ms. Seithel has retained the well-respected and qualified law firm of Lopez and McHugh to serve as local counsel in the matters pending in Pennsylvania.

43.   Therefore, F&P's concocted concerns regarding the representation of clients who elected to be represented by Defendants have been remedied and

those clients are not therefore in imminent danger of the unspecified harms
incredulously asserted by F&P.

44.     Additionally, because there was nothing improper or unlawful in
Ms. Seithel's sending letters to clients whose cases she was handling or had a
principal role in providing legal services to those clients, the interference with
F&P's relationship with its clients is insufficient alone to establish irreparable
harm.

45.     Further, any interference or loss of the relationship could be
compensated with monetary damages.

46.     Moreover, the temporary restraining order in place has adequately
alleviated F&P's immediate fears of irreparable injury and F&P has not
established that Defendants' have engaged in any behavior in the past several
months that requires the intercession of the Court.

47.     Even further confirming the lack of irreparable harm, F&P waited
over two months before seeking this injunctive relief.

### Plaintiff Has Not Established That Greater Harm Will Result From Refusing To Grant The Injunction Than From Granting It

48.     The freedom of a client to have the representation of his or
her choice is paramount.

49.     Accordingly, the imposition of a preliminary injunction in
this matter as requested by F&P would impede the rights of the clients at issue
to be represented by the attorney of his or her choice.

50.     F&P has not established any harm that would result if

the injunction was refused other than the loss of certain client relationships

which can be compensated by monetary damages.

51.    Specifically, there is no evidence of continuing interference

with its client base or relationship with referring attorneys.

52.    Therefore, there is no threat continued misrepresentations if an

injunction is not entered.

### Plaintiff Has Not Established That An Injunction Will Restore The Parties To Their Status Quo

53.    At all times prior to her termination, Ms. Seithel was handling the

cases for the clients that elected to be represented by Defendants and had a

principal role in the delivery of legal services to those clients.

54.    Therefore, granting an injunction would **not** restore the

parties to their status quo.

55.    Further, as evidenced by Defendant's testimony at trial and

Plaintiff's concession that Lopez and McHugh are competent counsel, the rights

of all the clients who elected to remain with Defendants continue to be fully

protected.

### Plaintiff Has Not Established That The Requested Injunction Is Reasonably Suited To Abate The Offending Activity

56.    Plaintiffs seek to prevent Defendant from having any

communications with client that have elected them as their counsel.

57.    Because Defendants' letters were not improper and Plaintiff has

since had the full opportunity to correct any purported misrepresentations that

it believes exist, the requested injunction is not reasonably suited to abate the activity which it claims is objectionable.

## The Denial Of The Preliminary Injunction Will Better Serve The Public Interest

58.    The right of clients to choose their counsel is so important that the Pennsylvania Supreme Court adopted a rule prohibiting any agreement that could impede that freedom of choice.  Rule 5.6, Pennsylvania Code of Professional Responsibility.

59.    The imposition of a preliminary injunction would have the exact effect Rule 5.6 sought to prevent.

60.    Therefore, denial of the preliminary injunction will preserve the rights of the clients at issue here to choose who they want to represent them, and in turn will better serve the public interest.

## Plaintiff Is Not Entitled To A Preliminary Injunction Because Plaintiff Acted With Unclean Hands

61.    The doctrine of "unclean hands is a defense in equity when a court finds a party seeking affirmative relief to be guilty of fraud, unconscionable conduct or bad faith directly related to the matter at issue, which injures the other party and affects the bounds of equities between litigants. *Equibank v. Adle Inc.*, 595 A.2d 1284 (Pa. Super 1991).

62.    In the present matter, the evidence establishes that Plaintiff acted in bad faith when it called clients and referring attorneys and provided disparaging information about Ms. Seithel and also when it sent out disparaging letters to clients and referring counsel regarding Ms. Seithel,

causing a small number of clients to reverse their decisions to chose Lynn Seithel and Seithel Law LLC to be their representatives in their pending cases.

WHEREFORE, based on the above Findings of Fact and Conclusions of Law and the underlying testimony and exhibits submitted during the hearings before the Court from October 12, 2011 through November 3, 2011, Defendants respectfully suggest that Plaintiff's Motion for a Preliminary Injunction must be denied.

Respectfully submitted,

SPECTOR, GADON & ROSEN, P.C.

By:___/s/ Alan B. Epstein_____
      Alan B. Epstein (ID No. 02346)
      Jennifer Myers Chalal (ID No. 77841)
      1635 Market Street – 7th Floor
      Philadelphia, PA 19103
Dated:  November 21, 2011      (215)241-8888

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November, 2011, I caused a true and correct copy of *Defendants' Proposed Finding of Fact and Conclusions of Law* to be filed on the electronic filing system for the U.S. District Court for the Eastern District of Pennsylvania and served on the following counsel via electronic mailing:

Marc J. Zucker, Esquire
Jennifer Hiller Nimeroff, Esquire
WEIR & PARTNERS, LLP
The Widener Building, Suite 500
1339 Chestnut Street
Philadelphia, PA  19107
mzucker@weirpartners.com

/s/ *Jennifer Myers Chalal*
Jennifer Myers Chalal

31