## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **FELDMAN & PINTO, P.C.,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 11-5400** |
| | : | |
| **MARTHA LYNN SEITHEL and SEITHEL LAW LLC,** | : | |
| | : | |
| **Defendants.** | : | |

**Tucker J.**                                                    **December ___, 2011**

Presently before the Court is Plaintiff's Motion for Preliminary Injunction (Doc. 5), Defendant's Response in Opposition thereto (Doc. 18), and all related exhibits, transcripts, and argument presented to the Court during the preliminary injunction hearing on October 12-14, 2011; October 26-27, 2011; and November 2-3, 2011. For the reasons set forth below, and upon consideration of all the evidence, this Court will grant Plaintiff's Motion for Preliminary Injunction.

## I.       PROCEDURAL BACKGROUND

This action was filed in the Philadelphia Court of Common Pleas on August 25, 2011. Defendants removed this matter to this Court on August 26, 2011. Plaintiff filed a Motion for Preliminary Injunction and Special Injunction on August 26, 2011, and a Temporary Restraining Order was issued by Emergency Judge Sanchez on August 29, 2011. Thereafter, a Preliminary Injunction Hearing was held before this Court on October 12-14, 2011; October 26-27, 2011; and November 2-3, 2011.

II.     **BACKGROUND AND FINDINGS OF FACT**

Plaintiff, Feldman & Pinto, P.C., ("Plaintiff" or "Feldman & Pinto") is a Pennsylvania professional corporation engaged in the practice of law with its principal place of business located at 1604 Locust Street, 2R,  Philadelphia County, Pennsylvania, 19103. (Compl. ¶ 1). Laura Feldman ("Feldman") is the president and sole shareholder of Feldman & Pinto. (Compl. ¶ 2).  Defendant Martha Lynn Seithel ("Seithel") is an attorney and resident of South Carolina, with a home address of 4110 East Amy Lane, John's Island, South Carolina, 29455. (Compl.  ¶ 3).  Defendant Seithel Law, LLC ("Seithel Law") is a South Carolina limited liability company with its registered address at 4110 East Amy Lane, John's Island, South Carolina, 29455. (Pl.'s Ex. 26, 33, 34). Defendant Seithel is currently an attorney with Seithel Law, LLC. (Compl.¶ 4). The firm of Seithel Law LLC consists of Seithel, a paralegal, an administrative assistant, and a "couple of interns." (Tr. 11/2/11, 87:24-88:7; Pl.'s Ex. 27, Tr. 18:17-19:4). The articles of incorporation for Seithel Law LLC were registered with the South Carolina Department of State on July 20, 2011. (Pl.'s Ex. 31, 33, 34).

Prior to establishing Seithel Law LLC, Seithel was employed by the South Carolina law firm of Motley Rice, LLC for eight and one half years. (Tr. 11/2/11, 7:1-2). While at Motley Rice, Seithel focused her practice in pharmaceutical litigation, in which she participated in pre-litigation activities such as taking depositions, preparing parties for depositions, creating liability and causation packages, drafting motions, consulting with experts, and other aspects of preparing cases for trial. (Tr. 11/2/11, 7-9).

Seithel became a full employee of Plaintiff in February 2010, after spending the month of

January 2010 in a "transitionary period" in which she was co-employed by both Motley Rice and

Plaintiff. (Tr. 10/12/11, 19:7-10; Tr. 11/2/11, 17:17-18:13). Feldman & Pinto is a personal injury

practice, (Tr. 10/12/11, 15:23-24), and for the last five years has "almost exclusively" done

medical malpractice and pharmaceutical litigation. (Tr. 10/12/11, 16:3-4). Plaintiff began doing

pharmaceutical work four or five years before Seithel became an employee of the firm, working

on cases involving various drugs including Effexor, Paxil, Reglan, Yaz, and Trasylol. (Tr.

10/12/11, 20:11-19). Before Seithel arrived at Feldman & Pinto, the firm had an inventory of

between 500 and 600 Paxil, 50-60 Yaz cases, but no Avandia cases. (Tr. 10/12/11, 21:20-25,

22:1-9).

Plaintiff hired Seithel as an employee-at-will with an annual salary of $250,000.

(Complaint ¶ 7; Tr. 10/12/11, 19:5, 23:20). Plaintiff hired Seithel because she had "a great deal

of potential" and "a lot of ideas and knowledge about pharmaceutical practice." (Tr. 10/12/11,

19:13-15). Seithel also represented to Plaintiff that she could bring a large group of

pharmaceutical cases to the firm because she had a "multitude of contacts" that would be

interested in using Plaintiff in Philadelphia. (Tr. 10/12/11, 19:16-20). Although Seithel referred

to herself as a partner at Feldman & Pinto, and introduced evidence at the injunction hearing that

other members of Feldman & Pinto also referred to Seithel as a partner, Plaintiff denies that

Seithel was ever partner at Feldman & Pinto. (Defs.' Ex. 40, Defs.' Ex. 45; Tr. 10/27/11, 39-41).

Shortly after Seithel began her employment with Plaintiff, the firm began to have some

concerns with Seithel's work performance. For example, Laura Feldman was concerned that

Seithel spent the months of January through March 2010 in Ocala, Florida for a series of horse

shows, and a number of Feldman & Pinto employees testified that Seithel was difficult to reach

during her time in Florida. (Compl. ¶ 11; Tr. 10/27/11, 133:16-18; Pl.'s Ex. 27.A, Tr. 41:19-21).

Seithel was also charging personal expenses to the firm credit card. (Compl. ¶ 11(b)). Seithel's

paralegal at Feldman & Pinto, Bouyeh Zulu ("Zulu"), also described Seithel as "very

demanding," "unresponsive to clients," and said that Seithel procrastinated and was often

difficult to contact. (Tr. 10/26/11, 55:6-11).  Seithel's absence from the firm led Laura Feldman

to consider terminating Seithel's employment as early as the winter of 2010, but Feldman

decided against it. (Tr. 10/12/11, 27: 2-13; Tr. 10/27/11, 133:16-18).

Despite Plaintiff's concerns, Seithel's performance improved throughout the remainder

of 2010. Feldman saw Seithel "blossom" when Seithel began gathering a group of cases

involving a drug named Paxil from across the country for settlement. (Tr. 10/12/11, 28:1-11).

Because Seithel had developed such a large book of cases, the firm increased her salary. (Compl.

¶ 14). However, Seithel returned to Florida to tend to her horses in January-March 2011, and

Seithel again became unreachable. (Compl. ¶ 15). Plaintiff also learned that many of the Paxil

cases which Seithel had apparently brought to the firm were from firms with whom Plaintiff had

already established relationships, and the firm actually had to return a group of the cases to one

of those firms. (Compl. ¶ 15(e); Tr. 10/12/11, 29:16-30:6).

At some point in May or April 2011, in a meeting between Feldman, Rosemary Pinto

("Pinto") (the other lawyer after whom Feldman & Pinto is named), and Seithel, Feldman told

Seithel that her employment relationship with Plaintiff was not working out as the firm had

hoped. (Compl. ¶ 16). Feldman suggested that Seithel and Plaintiff should "part ways," and

offered to continue Seithel's employment long enough for Seithel to make plans for her future,

including beginning her own practice. (Compl. ¶ 16; Tr. 11/2/11, 51: 3-13). Then, on the

morning of June 13, 2011, Feldman asked Zulu to access client files located on the firm's "Dropbox," an online repository of electronic files in which Seithel had been storing client information. (Compl. ¶ 19).  Prior to June 13, Zulu had been able to access the Dropbox using the username and password that Seithel had given her for the Dropbox. (Tr. 10/26/11, 60:15-61:5). On the morning of June 13, however, Zulu could not access the Dropbox although she used the same username and password that she had always used. (Tr. 10/26/11, 61:8-15). Believing that Seithel had locked Plaintiff out of the Dropbox, Feldman decided to terminate Seithel's employment immediately. (Compl. ¶ 19).

Seithel heard of her termination through Clint Casperson, a Texas attorney who had called the office of Feldman & Pinto on June 13 and was informed that Seithel was no longer employed there. (Tr. 11/2/11, 68:14 - 69:12). After receiving correspondence from Casperson regarding her termination, Seithel called Feldman, and Feldman informed Seithel that she was terminated because Feldman was unable to access the Dropbox. (Tr. 10/12/11, 39:16-18; Tr. 11/2/11, 69:25-70:4). After her termination, Seithel took no action to restore Plaintiff's access to the Dropbox. (Tr. 10/12/11, 40:1-6). Seithel denies locking Plaintiff out of the Dropbox, but to date, Plaintiff is still unable to access the files in the Dropbox. (Tr. 11/2/11, 76:9-16; Tr. 10/12/11, 40:1-6). Plaintiff sent Seithel formal notice of her termination via letter on June 15, 2011, in which Laura Feldman also demanded access to the Dropbox files; return of Firm property including office keys, apartment keys, an I-pad, all client files, and all office supplies charged to Feldman & Pinto; and reimbursement of personal charges on Seithel's company credit card. (Compl. ¶ 22; Pl.'s Ex. 1).

Prior to her termination, Seithel had sought the advice of an ethics expert to advise her

regarding opening her own practice, and took steps toward establishing that practice. (Tr. 11/2/11, 55:3-24).  Then, on the day that she learned of her termination, Seithel proceeded to contact a number of referring attorneys and clients with whom Plaintiff was associated. For example, on June 13, 2011, the day of her termination, Seithel sent numerous e-mails to referring attorneys who worked with Plaintiff which informed them that Seithel had "left Feldman & Pinto and started [her] own firm" and that Seithel hoped that they would "continue to work together." (Pl.'s Ex. 5, Seithel 006-024). Then, on July 7, 9, and 12, 2011, Seithel sent letters to approximately 450 of Plaintiff's clients. The letters averred the following:

A.      Seithel "recently left the firm of Feldman & Pinto." (Pl.'s Ex. 5).

B.      Seithel had "primary responsibility for [the client's] claims." (Id.).

C.      Seithel "now practice[s] as Seithel Law, LLC, based in Charleston, South Carolina."(Id.).

D.      Seithel Law, LLC has "an experienced team in place with over twenty years of combined experience prosecuting, litigating and resolving pharmaceutical cases and continue[s] to represent . . . clients." (Id.).

E.      Seithel has "been involved in [the client's] litigation in a leadership position since the beginning of the lawsuits." (Id.).

F.      "With [Seithel Law, LLC's] extensive experience and knowledge, Seithel Law, LLC is well suited to complete the work on your file." (Id.).

All of the letters were written on paper bearing the letterhead "Seithel Law, LLC." (Id.). The letters provided the contact information for Seithel (800-818-5329) and Plaintiff (215-564-2604), as well as the contact information for the client's referring attorney when applicable. (Id.) The

letters indicated that the clients' "decision as to whom [they] want to perform legal services is entirely [theirs] to make" and that Seithel was "certainly willing, and desire[d] to continue representing [them]." (Id.) The letter also instructed the clients to "indicate on the enclosed Consent for Representation form" if the clients wished for Seithel "to continue the work in [their] case; "if [they] wish[ed] to have Feldman & Pinto maintain responsibility for [their] file;" or "if [they] wished to have [their] file transferred to some other attorney." (Id.) Attached to each letter was a "Consent to Representation" form which laid out three choices for the clients: 1) "I wish for my case to go with Lynn Seithel, Esquire;" 2) "I wish for my case to go with Feldman & Pinto;" or 3) "I wish for my case to go to [another law firm]." (Id.). Lastly, all of the letters purported to carbon copy Plaintiff. (Id.)

Plaintiff first learned about the letters on July 14, 2011, when a Feldman & Pinto client, Thomas C., called Plaintiff expressing confusion regarding why he received such a letter from Seithel. (Tr. 10/12/11, 43:6-15). That same day, Laura Feldman wrote to Seithel's lawyers demanding that Seithel cease sending the letters to Feldman & Pinto clients. (Pl.'s Ex. 3). Then, on July 15, 2011, a large box containing the letters that Seithel sent arrived at Plaintiff's office. (Tr. 10/12/1,1 55:2-14; Pl.'s Ex. 4). Although not all of the clients that received Seithel's letter returned election forms, of those that did, at least 140 clients elected to have Seithel represent them. (Pl.'s Ex. 6).[1] Plaintiff received these election forms from Seithel in a piecemeal fashion. (Tr. 10/12/11, 65:10-20).

After Plaintiff received these election forms, Plaintiff began making efforts to contact the

---

[1] The court's own count of Plaintiff's Exhibit. 6 revealed that 153 clients and referring attorneys returned election forms selecting Seithel.

clients and referring attorneys that had elected Seithel. Plaintiff initially reached out to referring attorneys via letter which stated: "we suddenly found it necessary to terminate Lynn Seithel's employment with our firm. It has now been brought to our attention that in an effort to establish a fee interest for herself, Lynn has been soliciting certain referring counsel with whom Feldman & Pinto has contracts and in some instances has even been calling the clients directly." (Defs.' Ex. 12).

Plaintiff also reached out to clients who received letters from Seithel. For example, on or about August 12, 2011, Bouyeh Zulu was instructed by Laura Feldman to call clients that had elected to be represented by Seithel, and Pinto gave Zulu a script regarding what to say to those clients. (Tr. 10/26/11, 118:7-13; 110:1-8). The script essentially required Zulu to tell the clients that Seithel was a disgruntled employee that was terminated from Feldman & Pinto, who had never tried a case, was not licensed in Pennsylvania, and who was " seeking to gain clients for her own advantage." (Tr. 10/26/11, 110:13-18). In one e-mail drafted by Zulu to Avandia clients, Zulu wrote that Seithel was " a disgruntled employee who was fired from our firm and has been trying to solicit clients." (Defs.' Ex. 13). The e-mail told  clients to " [p]lease dismiss any letters, emails or correspondence" which Seithel may have sent because the letters "falsely impl[ied] that [Seithel] has been in a leadership role" in their cases "when in fact [Seithel] was merely assisting the partners of the firm (Laura Feldman & Rosemary Pinto) who have solidified the Avandia settlement deal that [they] are now a part of." (Id.). The e-mail also instructed any clients that had "accidentally" signed paperwork from Seithel to  inform Zulu that they had so that the firm could "mail [them] an affidavit of service that will rectify the situation immediately." (Defs.' Ex. 13).

An attorney for Feldman & Pinto, Bradley McDermott ("McDermott"), also reached out

to clients who elected Seithel to represent them. Specifically, McDermott was asked to contact some Avandia clients who were included in a list for a potential settlement. (Tr. 10/27/11, 136:13-18). McDermott explained to these clients that "there were certain things that Lynn had said in the letter that were not accurate and may be misleading . . . and . . . after [McDermott] explained to [the clients] the circumstances, they all admitted that they were confused. They thought that they had to make an election. . . . and every one of them wanted to stay with Feldman & Pinto after [McDermott] got done talking to them." (Tr. 10/27/11, 138:5-22). The clients told McDermott, "based upon what was written in the letter they wanted Lynn Seithel because she had said she had taken the leadership role in their case." (Tr. 10/27/11, 143:16-19).

In confirmation of these phone calls, on August 22, 2011, McDermott sent out letters to the clients who told him that they wished to retract their election of Seithel. The letter stated that "Ms. Seithel's letter made several misleading and exaggerated statements about her past role in your Avandia litigation while at Feldman and Pinto as well as her experience and ability to finish the work on your file. The letter left clients, like yourself, under the mistaken impression that you had to make an election as to what law firm you wanted to continue to act as your attorney. In truth, there was no decision to make." (Defs.' Ex. 31).

As a result of Plaintiff's correspondence with Feldman & Pinto clients who elected Seithel, approximately thirty-three (33) clients submitted oral or written retractions of their election. (Pl.'s Ex. 7, 7A). At least one other client, however, was noticeably upset by the confusion that ensued as a result of Seithel's departure from Feldman & Pinto. On August 4, 2011, one client, Erika D., sent an e-mail to Plaintiff, complaining that a staff member at Feldman & Pinto gave her "inaccurate and confusing information" by telling her that Seithel was

"not qualified to proceed with [her] case" and was merely "helping" the attorneys working on her

case. (Defs.' Ex. 8). Erika D. explained that she had "never once" been contacted by anyone

other than Seithel, and that she had made her decision regarding her representation when she

chose to have Seithel represent her back in July 2011.  (Defs.' Ex. 8). Erika D. also wrote that

Plaintiff's "lack of organization and communication has shown a lack of professionalism and

proven a blatant lack of interest and respect for [her] case" and "tainted [her] regard for [the]

firm." (Defs.' Ex. 8). In addition, at least one law firm, the Law Firm of Tor Hoerman, wrote

directly to Feldman & Pinto indicating that it wished for cases involved in certain Paxil

settlement negotiations to remain with Seithel because the firm had "only worked with Lynn on

these cases" and Seithel was "very familiar with the facts of the cases and ha[d] put in substantial

time preparing them for negotiation." (Defs.' Ex. 32).  In contrast, Allison Soloff ("Soloff"), a

referring attorney who worked with Plaintiff, testified that she found Seithel's letters to clients

misleading because her clients "had never spoken to Seithel," and had only communicated with

Soloff and her staff. (Tr. 10/26/11, 20:3-17).

On August 26, 2011, upon Plaintiff's Motion for Preliminary Injunction/Temporary

Restraining Order, Judge Sanchez entered a Temporary Restraining Order ("TRO") which

prohibited Seithel from: (1) soliciting, representing, or communicating with any client of

Feldman & Pinto absent Plaintiff's explicit written consent; (2) collecting any fee income from

services rendered on behalf of any such client; and (3) communicating with any referring attorney

or co-counsel, with respect to the representation of a Feldman & Pinto client whose case has

been, or is to be, filed in the Philadelphia Court of Common Pleas. (Pl.'s Ex. 8). The TRO also

prohibited Plaintiff from initiating any contact with clients who had elected Seithel as their

representative prior to August 26, 2011, and required Plaintiff to treat any election forms

received before August 26, 2011 as presumptively valid. (Id.)

In spite of the TRO, the Court permitted Plaintiff to initiate contact with three Feldman &

Pinto clients who elected Seithel as their representative prior to August 26, 2011 for the sole

purpose of deposing these clients. When Van B. elected Seithel, he did not know who she was

and "thought she worked for [the referring firm] who was working the case." (Defs.' Ex. 15, Tr.

10:1-3). Moreover, Van B. got the impression that Seithel had been fired, and, for that reason, he

wanted his case to stay with Plaintiff. (Defs.' Ex. 16, Tr. 21:23-22:15).  Van B. also testified that

Seithel continued to call him after he declined her representation. (Defs.' Ex. 16, Tr. 11-12).

Another client, Gloria C., also mainly wished to return her case to Plaintiff because she learned

that Seithel had been fired. (Pl.'s Ex. 30, Tr. 20:21-21:4). When Gloria C. elected Seithel, Gloria

assumed that Seithel was merely another lawyer with Feldman & Pinto. (Pl.'s Ex. 30, Tr. 10:2-4).

However, Seithel told Gloria C. that she had actually quit Feldman & Pinto. (Pl.'s Ex. 30, Tr.

10:9). Moreover, with regard to the remaining content in the letter Seithel sent to her, it appeared

not to matter to Gloria C. what Seithel's qualifications were, provided that Seithel was not lying

about them, and provided that Gloria C. received part of the settlement money for her Avandia

claim. (Pl.'s Ex. 30, Tr. 19, 22-25).  Lastly, Thomas P., testified that he believed he was "tricked"

into selecting Seithel on the consent to representation form because she listed her name, rather

than Feldman & Pinto, first on the form.  (Defs.' Ex. 14, Tr. 12:9-20). Thomas C. also testified

that Seithel told him that he could not change his election, and encouraged him not to attend his

deposition. (Defs.' Ex. 14, 17:9). Seithel denies both of these allegations. (Tr. 11/2/11, 237:13-

21).

-11-

### III.    LEGAL STANDARD

"[T]he grant of injunctive relief is an 'extraordinary remedy which should be granted only in limited circumstances.'"AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994); see also  Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (citing Frank's GMC Truck Ctr, Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).  Generally, in determining whether to grant a preliminary injunction or a temporary restraining order, courts in this Circuit review four factors: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.  Shire US, Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003) (citations omitted).  "[W]hile the burden rests upon the moving party to make [the first] two requisite showings, the district court 'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.'"Acierno v. New Castle Cnty., 40 F.3d 645, 653 (3d Cir. 1994) (citation omitted); see also Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. 2000) (noting that "[i]f relevant, the court should also examine the likelihood of irreparable harm to the nonmoving party and whether the injunction serves the public interest.")  All four factors should favor relief before an injunction will be issued.  S & R Corp. v. Jiffy Lube Int'l. Inc., 968 F.2d 371, 374 (3d Cir. 1992) (citing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 192 (3d Cir. 1990)).  When a movant seeks a preliminary injunction that is directed at not merely preserving the status quo but at providing mandatory relief, the burden on the moving party is "particularly heavy."  Punnett v. Carter, 621

F.2d 578, 582 (3d Cir. 1980).

## III.    CONCLUSIONS OF LAW

Courts will issue a preliminary injunction only where the following four factors weigh in favor of this extraordinary measure: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.  However, before reaching factors three and four, the moving party must first satisfy its burden with respect to factors one and two. Adams, 204 F.3d at 484.  If a plaintiff fails to satisfy this burden, this is the end of the inquiry, and a preliminary injunction will not be issued.

### A.    Likelihood of Success on the Merits

The first factor of the preliminary injunction analysis, likelihood of success on the merits, weighs in favor of Plaintiff. Plaintiff asserts the following claims in its Complaint: (1) intentional interference with contractual relations; (2) conversion; (3) unjust enrichment/constructive trust; (4) fraud and misrepresentation; (5) breach of duty of loyalty; and (6) breach of contract. However, the Court will only address the claim which the parties have briefed in full: intentional interference with contractual relations. Pennsylvania has adopted the Restatement Second of Torts § 766, which provides that "[o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss to the other from the third person's failure to perform the

contract." <u>See</u> <u>Adler, Barish, Daniels, Levin and Creskoff v. Epstein</u>, 393 A.2d 1175, 1183 (Pa.

1978). To establish intentional interference with contractual relations, Plaintiff must establish:

"(1) the existence of a contractual, or prospective contractual relation between the complainant

and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm

the existing relation, or to prevent a prospective relation from occurring; (3) the absence of

privilege or justification on the part of the defendant; and (4) the occasioning of actual legal

damage as a result of the defendant's conduct." <u>Crivelli v. Gen. Motors Corp.</u>, 215 F.3d 386, 394

(3d Cir. 2000). "What is or is not privileged conduct in a given situation is not susceptible of

precise definition," <u>Glenn v. Point Park Coll.</u>, 274 A.2d 895, 899 (Pa. 1971), but is generally

viewed as those "interferences which are sanctioned by the 'rules of the game' which society has

adopted, and to the area of socially acceptable conduct which the law regards as privileged." <u>Id.</u>

(quotations omitted) (citing Harper & James, The Law of Torts, § 6.11, at 510, 511).

In assessing whether a defendant's conduct is proper, "consideration is given to the

following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of

the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the

actor, (e) the proximity or remoteness of the actor's conduct to the interference, and (f) the

relations between the parties." <u>Adler Barish</u>, 393 A.2d at 1184. Notably, however, "there is . . .

no liability for interference with a contract or with a prospective contractual relation on the part

of one who merely gives truthful information to another." <u>Walnut St. Assocs., Inc. v. Brokerage</u>

<u>Concepts, Inc.</u>, 20 A.3d 468, 478 (Pa. 2011) (quoting RESTATEMENT (SECOND) OF TORTS § 772

(1979).  When a defendant raises a so-called "truth defense" to a claim for intentional

interference with contractual relations, the court need not analyze the factors set out in <u>Adler</u>

Barish regarding the type of conduct that qualifies as proper. Id. (holding that "where a Section 772(a) truthfulness defense is raised against claims of tortious interference, analysis of the general factors enumerated in Section 767 is not necessary").

In examining Plaintiff's likelihood of success on the merits of its claim, both parties rely on the case of Adler, Barish, Daniels, Levin and Creskoff v. Epstein quite heavily. In that case, the defendants were salaried associates of the law firm of Adler Barish. Adler Barish, 393 A.2d at 1177. While still working for the law firm, the defendants decided to form their own law firm, and began taking steps toward that goal. Id. The defendants retained counsel to advise them in their business venture, and as a part of the defendants' loan application for their new firm, they included a list of eighty-eight cases and anticipated legal fees -- all cases that belonged to Adler Barish but on which the defendants had worked. Id. Although Epstein's employment terminated on March 10, 1977, he continued to use the firm office until March 19, during which time Epstein initiated contacts with Adler Barish clients with open cases on which he had worked. Id. Epstein also mailed clients form letters that could be used to discharge Adler Barish, name Epstein as new counsel, and create a contingent fee agreement. Id. at 1178. The remaining defendants participated in similar efforts to procure Adler Barish clients. Id.

The parties also refer to Joseph D. Shein , P.C. v. Myers. In that case, three "breakaway attorneys" decided not to become partners in the Shein organization, and instead, unbeknownst to Shein, arranged financing with a bank and rented office space in preparation for opening their own firm. 576 A.2d 985, 986 (Pa. Super. Ct. 1990). Early one morning, the breakaway attorneys, without Shein's permission or knowledge, used a rental truck to remove about four hundred case files from Shein's office. Id. Then, the breakaway attorneys proceeded to contact many of Shein's

clients, asking them to leave the Shein firm and become clients of the breakaway attorneys' new firm. Id.  The court found that the attorneys' acts of surreptitiously removing four hundred files, making "scurrilous statements about the Shein firm," and sending "misleading letters to clients accompanied by forms to be used by clients to discharge the Shein firm" all constituted tortious interference. Id. at 989.

It is apparent that the clients who Seithel contacted had existing contractual relationships with Plaintiff, and that Seithel, by writing letters to them, intended to interfere with the clients' performance of those contracts. In this regard, the case is very similar to Adler, Barish. In Adler Barish, the court found that there was no doubt that the defendants intentionally sought to interfere with the performance of contractual relations between Adler Barish and its clients because the defendants' behavior in sending form letters to Adler Barish clients indicated their desire to gain a segment of the firm's business. Adler Barish, 393 A.2d at 1183. Similarly, Seithel sent letters to Feldman & Pinto clients which gave the clients the option of choosing Seithel's representation over Plaintiff's, in the hopes of gaining business for her new law firm, Seithel Law, LLC. Moreover, neither party disputes that Feldman & Pinto had existing contractual agreements with the clients and referring attorneys who received Seithel's letter.

Therefore, as in Adler Barish and Shein, the key issue is whether Defendants' conduct was proper. Because the truthfulness defense, if applicable, renders the remaining analysis of what conduct qualifies as proper unnecessary, the Court will consider this defense first.[2]

_____

[2] The Court notes Defendants' argument that Walnut Street "inexorably altered" the decisions in Adler Barish and Shein. Because the Court finds that Seithel's letter was not truthful, and therefore, the defense of truth as set forth in Walnut Street does not apply, the Court will not broach this issue.

### 1.      Truthfulness Defense

The letters that Seithel sent were not truthful, at least with regard to many of the clients who received them. Defendants argue that the statements and representations made in Seithel's letter to the clients were "accurate, true and not misleading in any way." However, Plaintiff argues that Seithel's letter to clients was misleading in several ways:

A.      Although Seithel represented to the clients that she had "primary responsibility" for their claim, Laura Feldman & Rosemary Pinto had primary responsibility for all significant stages of litigation.

B.      Although Seithel represented that she had an "experienced team in place with over twenty years of combined experience prosecuting, litigating and resolving pharmaceutical cases," this "team" includes only Seithel, a sole practitioner with ten years of experience, and a single paralegal. Moreover, although Seithel claimed to have experience litigating pharmaceutical cases, Seithel had never litigated a case.

C.      Seithel represented that she had been "in a leadership position since the beginning of the lawsuits," when in fact Seithel has never held such positions.

D.      Seithel represented that Seithel Law, LLC was "well-suited to complete the work on your file," when in fact Seithel's experience was limited, and Laura Feldman found that Seithel was unable to complete the discrete tasks assigned to her, and lacked the courtroom skills or experience to complete work on the firm's files.

E.      Seithel implied that the clients needed to complete the election form attached to the letter, when in fact they needed to do nothing in order to keep their cases with Feldman & Pinto.

F.    Seithel provided a toll-free number for Seithel Law, LLC, but only a toll number for
      Plaintiff, even though Plaintiff has a toll-free number as well.

G.    Seithel wrote the letters on letterhead bearing the name Seithel Law, LLC, when the
      entity did not yet exist.

H.    Seithel did not disclose that she was not admitted to the Pennsylvania Bar, and has no
      Philadelphia office.

I.    Seithel wrote that she "left the firm," implying that her departure was the result of a
      voluntary decision on her part rather than her termination.

J.    The letters purported to carbon copy Plaintiff, but Plaintiff did not receive the letters until
      several days after the clients received them.

The Court agrees with Plaintiff that Seithel's letter was misleading in several respects, at
least with regard to some clients. However, the Court will first dispose of those matters in the
letter that were not misleading. First, Plaintiff's argument that Seithel is incapable of handling
the clients' cases due to a lack of experience is also unpersuasive. Seithel testified at the
injunction hearing that her time at Motley Rice permitted her to gain a substantial amount of
experience in preparing cases for trial. The Court found this testimony to be credible and cannot
conclude that Seithel lacks experience.

Moreover, it is apparent to the Court, that Seithel did take a leadership role, and primary
responsibility, on the cases of some of the clients who received letters. For example, the letter
from the Law Offices of Tor Hoerman to Laura Feldman indicating that the firm had "only
worked with Lynn on these cases" and that Seithel was "very familiar with the facts of the cases

and ha[d] put in substantial time preparing them for negotiation," credibly demonstrates that Seithel did have primary responsibility for at least those cases. Similarly, the Court finds the e-mail from Erika D. regarding Seithel's representation to be credible evidence that Seithel was the main attorney that Diaz communicated with regarding her case at Feldman & Pinto.  In that e-mail, Erika D. indicates that she had been in primary contact with Seithel, and the attorneys who were allegedly handling her case had "never once contacted [her] on their own." Thus, it is apparent that, at least with some of the letters that Seithel mailed, she was being truthful as to her representations that she had primary responsibility for those clients' cases.

In contrast with Erika D. and Tor Hoerman's cases, however, it is evident that Seithel did not have primary responsibility for the cases of some of the clients to whom she wrote. For example, Alison Soloff testified that "there was a misrepresentation implicit in the letter" that Seithel sent to Feldman & Pinto clients.  Specifically, Soloff testified that the sentence in which Seithel claimed to have "primary responsibility" for the clients' claim was misleading because Soloff's clients "didn't know who [Seithel] was. They had never spoken to her. . . . All of the contact with these clients had been by either [Soloff] or members of [her] firm." Similarly, with regard to one letter to a client, Thomas C., Laura Feldman testified very credibly that although Seithel wrote to him that she had "primary responsibility" for his claim, it was actually Feldman that took all twenty-five major depositions in the case, procured all ten expert depositions, and was scheduled for a trial in federal district court in October 2011 in which Seithel was not participating. (Tr. 10/12/11, 46:23-47:16). Additionally, based on these facts alone, it is also evident that Seithel's statement that she had a leadership role in the various drug litigation matters was false for at least some of these cases. A person that took part in zero of twenty-five

-19-

depositions, or who had absolutely no contact with certain clients, can hardly be said to have a leadership role in a litigation.

Seithel also made other statements in her letter that would qualify as misrepresentations regardless of whether Seithel had primary responsibility for the case of the client who received the letter. For example, Seithel stated that she had an "experienced team in place with over twenty years of combined experience." However, Seithel's "team" consisted of one attorney with ten years of experience, a paralegal with ten years of experience, an administrative assistant, and a "couple of interns." The Court agrees with the Plaintiff's expert witness, Thomas Wilkinson ("Wilkinson"), that the unsophisticated client would assume that Seithel referred to twenty years of combined _attorney_ experience, rather than twenty years of combined attorney and non-attorney experience. (Tr. 10/26/11, 174:9-17).

Seithel's assertion that she "left" Feldman & Pinto was also untruthful. Although Plaintiff and Seithel disagree on whether Seithel actually locked Plaintiff out of the Dropbox database, both parties agree that Seithel was terminated on June 13, 2011 because Plaintiff _believed_ that Seithel locked the firm out of the Dropbox. Moreover, Seithel received a letter from Plaintiff indicating that her employment had been terminated due to "conversion of client files and other material belonging to Feldman & Pinto." Thus, the Court agrees with Plaintiff that Seithel's representation that she "left the firm of Feldman & Pinto" was misleading, because it suggests that the separation was voluntary. In fact, Feldman & Pinto clients appear to have been misled by these statements. Two of the three deposed clients, Gloria C. and Van B. indicated that they would not have elected to have Seithel represent them had they known she had been fired from Feldman & Pinto. _See_ Pl.'s Ex. 30, Tr. 20:21-21:4 (Gloria C. explaining that the fact that Seithel

was fired was one of the reasons she wished to return her case to Feldman & Pinto); Defs.' Ex. 15, Tr. 21:21-23 (Van B. explaining that learning Seithel was fired was "enough for [him] to say, 'Okay. I want my case to stay where it is'").

The Court also agrees that the nature of the election form, combined with the language of Seithel's letter itself, misled those clients for whose cases Seithel did not have primary responsibility. The letter requested that the clients indicate their choice of counsel on the election form whether they did or did not choose Seithel. McDermott also testified that the clients he spoke with believed that they "had" to make a choice, and the text of Seithel's letter did nothing to alleviate that belief. And, as Wilkinson testified, clients in such a "vulnerable posture" would "tend to sign whatever is first placed before them, especially if it's someone who expresses an interest in their matters." (Tr. 10/26/11, 18:7-19). While such language may have been appropriate for those clients for whose cases Seithel had primary responsibility, the language misled those clients for whom Seithel did not have primary responsibility into believing that they had to make an election.

It was also misleading for Seithel to have indicated in her letters, sent on July 7, 9, and 12, 2011, that she was now practicing under the law firm of Seithel Law, LLC, when in fact, the Articles of Organization for Seithel Law, LLC were not filed with the Secretary of State for South Carolina until July 20, 2011. Such a misrepresentation could have potentially influenced clients to select her for their representation. And again, the Court agrees with Wilkinson's testimony that omitting the fact that Seithel was not licensed to practice in Pennsylvania was also a misrepresentation that potentially misled the clients who received her letter. (Tr. 10/26/11, 176:20-177:3). It is also noteworthy that Defendants' expert, Samuel Stretton ("Stretton") also

admitted that whether a lawyer is licensed in the jurisdiction where the litigation is occurring is "a very important point and normally would be part of the letter." (Tr. 11/2/11, 141:21-24).

Based on the above, the Court finds that the defense of "truth" does not apply to the letter Seithel sent to Feldman & Pinto clients. Although Seithel may have had primary responsibility for some of the client's cases referred to in the letters, it is clear from the record that Seithel greatly exaggerated her role with regard to a number of the clients receiving the letter. Moreover, Seithel was not open and honest about many other representations in her letter, including the nature of her departure from Feldman & Pinto, the state in which she was barred, the "combined experience" of her team, the actual existence of the law firm of Seithel Law, LLC, and requiring clients to make an election when they did not have to. Such exaggerations and omissions were as misleading as any outright falsehood, and therefore, the truth defense to Plaintiff's claim for intentional interference with contractual relations does not apply.

### 2.    Properness of Defendants' Conduct

Seithel's conduct was improper because her conduct was both misleading, and in violation of the Rules of Professional Conduct. Again, both parties rely upon Adler Barish and Shein in arguing whether Seithel's conduct was proper. In Adler Barish, the court found "nothing in the 'rules of the game' which society has adopted' which sanction[ed] the departing attorney's conduct." Adler Barish, 393 A.2d at 1184. Instead, the court held that the Code of Professional Responsibility "expressly disapprove[d]" the departing attorneys' method of obtaining clients. Id. The court in Adler Barish described the departing attorneys' letters to clients as aimed "to encourage speedy, simple action by the client. All the client needed to do was to 'sign on the

dotted line' and mail the forms in the self-addressed, stamped envelopes. . . . In this atmosphere, appellees' contacts posed too great a risk that clients would not have the opportunity to make a careful, informed decision." Id. at 1181. These letters created the risk that the attorneys' contacts "too easily could overreach and unduly influence Adler Barish clients with active cases." Id. at 1184.  In accordance with the Restatement, the Pennsylvania Supreme Court found the attorneys' departure from the ethical code to be instructive in evaluating the nature of their conduct. Id. Similarly, in Shein, the court found that the "breakaway attorneys'" conduct was improper because they "surreptitious[ly] remov[ed] . . . four hundred files from Shein's offices," made "scurrilous statements about the Shein firm," and sent "misleading letters to clients" along with forms which the clients could use to discharge the firm. Shein, 576 A.2d at 989.

In Adler Barish, the Pennsylvania Supreme Court also relied on the Restatement Second of Agency which provides that "[U]nless otherwise agreed, after the termination of the agency, the agent . . . has a duty to the principal not to take advantage of a still subsisting confidential relation created during the prior agency relation." Id. at 1185. The court explained that the departing attorneys' contacts with the clients were possible because Adler Barish partners trusted them with the "high responsibility of developing its clients' cases," which permitted them to "gain knowledge of the details, and status, of each case to which [the attorneys] had been assigned." Id.

At the preliminary injunction hearing for this matter, the parties each introduced expert witnesses on the Pennsylvania Rules of Professional Conduct. Plaintiff's expert, Wilkinson, and Defendant's expert, Stretton, both testified about their knowledge of "Ethical Obligations When a Lawyer Changes Firms,"a joint formal opinion by the Pennsylvania Bar Association Committee

on Legal Ethics and Professional Responsibility and the Philadelphia Bar Association

Professional Guidance Committee. (Pl.'s Ex. 24). According to this joint formal opinion, when a

lawyer departs a firm, the clients entitled to notice of the lawyer's departure are: (1) clients for

whom the departing lawyer is currently handling active matters; or (2) clients for whom the

lawyer plays a principal role in the current delivery of legal services.  (Pl.'s Ex. 24 at 8). The duty

to communicate the lawyer's departure does not extend to clients "on whose matters the

departing lawyer did not work or worked only in a subordinate role in a way that afforded the

lawyer little or no direct client contact." (Id.) At the hearing, Wilkinson defined "subordinate" as

one who "act[s] at the direction of another more senior or other lawyer who may have primary

responsibility with respect to the handling of that client or that matter." (Tr. 10/26/11, 167:17-

21).

        The joint formal opinion recommends that communication of a lawyer's departure be

conducted jointly by the law firm and the departing lawyer. And, as is the case with all

professional communications by a lawyer, the communications regarding the lawyer's departure

must be truthful. Specifically with regard to communications concerning a lawyer's services,

Rule 7.1 of the Rules of Professional Conduct prohibits a lawyer from making "a false or

misleading communication about the lawyer or the lawyer's services. A communication is false

or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary

to make the statement considered as a whole not materially misleading." (Pl.'s Ex. 25, Rules of

Prof'l Conduct 7.1). Similarly, Rule 1.4 requires a lawyer to "explain a matter to the extent

reasonably necessary to permit the client to make informed decisions regarding the

representation." (Pl.'s Ex. 25, Rules of Prof'l Conduct 1.4). Moreover, Defendants' expert,

Stretton, testified that it is "best practice" for a departing lawyer to notify the firm that he is

contacting the clients by letter. (Tr. 11/2/11, 136:2-10).

Predictably, Defendants' expert concluded that Seithel's conduct complied with the Rules

of Professional Conduct, while Plaintiff's expert concluded that Seithel's conduct violated the

Rules. The Court is of the opinion that Seithel's conduct was improper because it violated the

Rules of Professional Conduct, and the basic duties that a lawyer owes to her old firm. As

Plaintiff's counsel explained, this case is similar to <u>Shein</u> because although Seithel did not

physically remove files from Plaintiff's office, Seithel essentially achieved the same result when

she locked Plaintiff out of the Dropbox database. Although Seithel denies locking Plaintiff out,

and asserts that Plaintiff had access to the Dropbox all along, the Court finds her argument to be

incredible -- especially given the fact that she has yet to aid Feldman & Pinto in restoring access

to the Dropbox. Thus, as in <u>Shein</u>, depriving Plaintiff access to client files, was, by itself,

improper.

The Court also finds Wilkinson's interpretation of Seithel's letter as it relates to the Rules

of Professional Conduct to be convincing. First, as set forth in the Court's discussion above

regarding the "truth defense," it is apparent that Seithel did not have primary responsibility for

the cases of many of the clients who received her letter. Therefore, for those clients, Seithel was

not "currently handling active matters," or playing "a principal role in the current delivery of

legal services" to those clients. Moreover, the misleading nature of the representations that

Seithel made in her letter, as set forth in Section One above, is also in violation of the duty to

communicate truthfully to clients, as prescribed by Rule 1.4 and 7.1.  In addition, some of the

actions of the attorneys in <u>Adler Barish</u> which led the court to find their conduct improper are

present here. For example, like the Adler Barish attorneys, Seithel also used confidential client

information, which she gained as a result of her relationship with Feldman & Pinto, in a way that

could have unduly suggested a course of action for the clients, and unfairly prejudiced Plaintiff.

And, as in Adler Barish, the Professional Rules prohibited Seithel's conduct. Seithel did

essentially the same thing as the departing lawyers in Adler Barish -- she sent election forms in

which clients had to do no more than sign on the dotted line without making a careful, informed

decision.  Thus, the Court concludes that Plaintiff has fulfilled its burden of demonstrating a

substantial likelihood that Seithel's conduct was improper, and therefore, a substantial likelihood

of success on the merits of its claim for intentional interference with contractual relations.

### B.      Irreparable Harm to Plaintiff

The second prong of the preliminary injunction analysis also favors Plaintiff. The second

factor Plaintiff must demonstrate is that Plaintiff will be irreparably harmed if the Court fails to

grant the injunction. That is, Plaintiff must show that failure of the court to issue an injunction

will result in imminent injury such that legal or equitable relief at the end of trial will not remedy

the harm. In order to prove irreparable harm, the moving party must "'demonstrate potential harm

which cannot be redressed by a legal or an equitable remedy following a trial." Acierno,  40 F.3d

at 653 (quoting Instant Air Freight Co., 882 F.2d at 801) (quotations omitted). "The word

'irreparable' connotes  that which cannot be repaired, retrieved, put down again, atoned for." Id.

(citations omitted).  In addition, the claimed injury cannot merely be possible, speculative or

remote.  "[M]ore than a risk of irreparable harm must be demonstrated.  The requisite for

injunctive relief has been characterized as a 'clear showing of immediate irreparable injury' or a

'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility

of a remote future  injury . . . .'" <u>Acierno</u>, 40 F.3d at 655 (citations omitted).

Defendants argue that Plaintiff has failed to satisfy its burden of establishing that denial of its injunction request will result in immediate and irreparable harm which could not be compensated with damages. Defendants argue that the clients' interests will be served because Seithel is a qualified attorney who has retained the respected law firm of Lopez and McHugh as local counsel in Philadelphia. Therefore, there is no imminent danger to clients, and any alleged interference or loss of business suffered by Plaintiff can be remedied by damages. Defendants also argue that Plaintiff's delay in seeking injunctive relief confirms that Plaintiff has suffered no irreparable harm. And finally, Defendants assert that the TRO presently in place has adequately alleviated any irreparable harm to Plaintiff, particularly because Defendants have not engaged in any behavior since entry of the TRO which would require court intervention.

Plaintiff on the other hand argues that monetary damages will not suffice to cure the harm that Plaintiff has incurred as a result of Seithel's conduct. Plaintiff argues that Seithel's actions have not only harmed its ability to serve as counsel to its clients, but may potentially lead to a number of lawsuits in which Plaintiff and the clients will be required to challenge each action or inaction of Defendants.  Plaintiff asserts that Seithel's conduct has also put the clients' cases in imminent danger: some deadlines are approaching; tolling agreements must be made or renewed, or suit must be filed; it is unclear whether Seithel is a party to these agreements; and Seithel failed to obtain these agreements when asked to do so. Similarly, Plaintiff suggests that Seithel is incapable of handling the cases at issue, and lacks the financial resources to represent these clients properly. And, for those clients that have elected Seithel, Seithel has improperly asked them to sign fee agreements which require arbitration in South Carolina in the event of a dispute.

Plaintiff also points out that many clients have expressed a desire to retract their election of Seithel, but Plaintiff is unable to assist them due to the terms of the TRO. Plaintiff also argues that if injunctive relief is denied, Feldman & Pinto's firm files will continue to be in jeopardy, the clients will be misled, and Plaintiff's fee interest with regard to these cases will remain unprotected.

The Court agrees that Plaintiff will suffer irreparable harm if injunctive relief is not granted. The competence (or lack thereof) of the breakaway attorneys in Adler Barish and Shein did not factor into the courts' preliminary injunction analysis. Correspondingly, this Court is reluctant to enter into such discourse. Therefore, the Court will only note what it has already concluded in this Opinion -- Seithel credibly testified at the preliminary injunction hearing that she is a competent legal practitioner. However, even without considering Seithel's competence, the facts at issue still indicate that Plaintiff will suffer irreparable harm if injunctive relief is not granted. Plaintiff produced evidence to demonstrate that it has already faced a loss of clients, and is currently unable to protect the interests of its clients due to the prior TRO entered by this Court. Moreover, Plaintiff remains unable to access its own client files because it has been locked out of the Dropbox. Both the courts in Adler Barish and Shein found such injury to be irreparable.

Moreover, the Eastern District of Pennsylvania has also recognized this type of injury as irreparable. For example, in Vector Security, Inc. v. Stewart, Jr., the defendant had a dealer-agreement with the plaintiff, and upon the termination of the dealer-agreement, the plaintiff learned that the defendant had been soliciting business away from the plaintiff, in violation of a restrictive covenant agreement. 88 F. Supp. 2d 395, 399 (E.D. Pa. 2000). The court held that

-28-

because the plaintiff's business was "premised on maintaining a long-term relationship with its subscribers," the defendant's act in "disturbing the established relationship between the employer and the customer" constituted irreparable injury. Id. at 401. The court explained that plaintiff's relationships with its customers were valuable because of the "possibility that it may sell additional services to the [customers] or receive referrals to new customers." Id. The court noted the importance of the restrictive covenant: to prevent sales that may result from prohibited contact, and to prevent disturbances of the established relationship between the plaintiff and the customer. Id. In light of this, the Court found that the total injury to the plaintiff from the loss of customers could not be easily predicted. Id.

Although the case now before the Court does not involve a restrictive covenant, the basic principles that resulted in a finding of irreparable injury in Vector are applicable here. Indeed, Seithel's conduct has put into jeopardy the attorneys fees that Plaintiff expected to receive from those clients that elected Seithel. However, more importantly, Seithel's conduct has also jeopardized Plaintiff's relationships with its clients and referring attorneys. This is evident from Erika D.'s e-mail to Plaintiff, which, due to the confusion resulting from Seithel's letter, expressed that Erika D.'s regard for the firm had been "tainted," and described the firm as having a "lack of organization and communication" and a "lack of professionalism." A law firm is nothing if it cannot establish long-term relationships with clients and referring law firms. Therefore, as in Vector, the damage that Seithel's conduct has done cannot be easily predicted.

Moreover, the harm to Feldman & Pinto's reputation is also an imminent injury that would fulfill the irreparable harm prong. The Court acknowledges that the Third Circuit has held that "showing some potential harm to reputation is usually insufficient to support a conclusion

that irreparable harm exists." Acierno, 40 F.3d at 654. Nonetheless, the Third Circuit has also

held that "the possibility of irreparable injury 'to [a plaintiff's] business and reputation'" will

warrant a preliminary injunction under some circumstances. Fitzgerald v. Mountain Laurel

Racing, Inc., 607 F.2d 589, 601 (3d. Cir. 1979). In Fitzgerald v. Mountain Laurel Racing, Inc.,

the Third Circuit held that there was irreparable injury to the business and reputation of a

licensed harness racing trainer as a result of his eviction from a racetrack. Id. In later cases, the

Third Circuit emphasized that its holding in Fitzgerald was premised upon the fact that the

plaintiff, a licensee of horse racing, was potentially barred, and not merely impaired, from

obtaining employment. See Acierno, 40 F.3d at 654; Morton v. Beyer, 822 F.2d 364, 373 n.13

(3d Cir. 1987). Similarly, in BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., the Third Circuit

held that the district court did not err in crediting testimony about the damage that would result to

the plaintiff's reputation to support its finding that the plaintiff would suffer irreparable injury

absent an injunction. 229 F.3d 254, 263 (3d Cir. 2000). The Third Circuit upheld the district

court's finding that the action at issue, involving potential disclosure of trade secrets, would give

rise to the "public perception that [the plaintiff] was unable to protect its proprietary trade

secrets," and qualified as irreparable injury.  Id.  In another case, the Third Circuit explained that

finding injury to reputation as grounds for irreparable harm may be proper when "the reputation

of the plaintiff was directly endangered by the defendant's actions." Bennington Foods LLC v.

St. Croix Renaissance, Group, LLP, 528 F.3d 176, 179 (3d Cir. 2008). In contrast, in Morton, the

Plaintiff argued that he also suffered irreparable harm because his name and reputation had been

damaged as a result of his illegal suspension from employment. Morton, 822 F.2d at 373 n.13.

The Third Circuit disagreed with Plaintiff's argument and found that there was no irreparable

harm because there was no "extreme deprivation," such as potentially being barred from obtaining employment. Id.

Seithel's conduct has jeopardized Plaintiff's reputation within the community of firms that specialize in mass pharmaceutical tort litigation in Philadelphia, as well as the firm's reputation on a national scale. The damage to Plaintiff's reputation, if Plaintiff is not permitted to take action to remedy Seithel's conduct, is not something that can be quantified in the form of monetary damages. The Court finds that this case is more like Bennington, Fitzgerald, and BP Chemicals than it is like Morton. In this case, there is an extreme deprivation in the sense that Seithel's actions have directly brought into question Plaintiff's mass pharmaceutical tort practice. The Third Circuit has even gone as far as calling a law firm's reputation its "primary stock in trade." Fellheimer, Eichen, & Braverman, P.C. v. Charter Techs., Inc., 57 F.3d 1215, 1229 (3d Cir. 1995). As Laura Feldman testified, Plaintiff has done mass pharmaceutical and medical malpractice work almost exclusively for the last four to five years, and therefore, Plaintiff's ability to maintain a good reputation among those who also do mass pharmaceutical tort work is invaluable. Seithel's conduct required the firm to send out letters to referring attorneys to assure them that the attorneys would not be involved in Plaintiff's "unpleasant employment dispute," and the dispute between Plaintiff and Seithel was recently publicized in the Legal Intelligencer. In the Philadelphia legal community, a law firm's reputation is key to a successful practice, and it is vital to a law firm that it be held in the high esteem of other law firms.  To deny Plaintiff the opportunity to take action and remedy this tarnished reputation would lead to irreparable injury which is difficult to calculate, and thus warrants an equitable remedy.

Lastly, under the irreparable injury analysis, the court is also permitted to consider the

possibility of harm to other interested persons if an injunction is not granted. See Acierno, 40

F.3d at 653. Here, the clients are an interested party who would be harmed if an injunction is not

granted. All of the three clients deposed in preparation for the injunction hearing testified that

they were confused about who Seithel was at the time that they elected to have her represent

them. It is inevitable that many more clients were also confused, and therefore, did not have the

benefit of informed decision-making in electing their representation. Moreover, Seithel provided

no evidence to indicate that she would remedy the tolling agreement issues which Plaintiff

introduced at the hearing. Thus, the problems that Plaintiff has pointed out are legitimate

concerns that have already actually harmed clients, and will likely lead to irreparable harm to

them in the future.

### C.    Risk of Harm to Defendants

The third prong of the preliminary injunction analysis also weighs in favor of Plaintiff. In

the third prong of the preliminary injunction analysis, the Court must evaluate the potential harm

to the nonmoving party if injunctive relief is granted. See Adams v. Freedom Forge Corp., 204

F.3d 475, 484 (3d Cir. 2000) (noting that "[i]f relevant, the court should also examine the

likelihood of irreparable harm to the nonmoving party").

Neither party specifically addressed whether Defendants will be harmed if injunctive

relief is granted. However, the Court believes that the harm to Defendants that may result from

injunctive relief does not weigh in Defendants' favor. Injunctive relief would merely give

Feldman & Pinto clients the opportunity to make an informed decision about their choice of

representation. Defendants will not be prevented from soliciting clients unaffiliated with

Feldman & Pinto. Moreover, although Defendants may lose some clients once the clients have

the proper information, Defendants will merely be returned to the status quo ante -- a result that

the Court does not find outweighs the benefits of granting injunctive relief.

### D.     Public Interest

The fourth prong of the preliminary injunction analysis, consideration of the public

interest, weighs in favor of the Plaintiff. In Adler Barish, the Pennsylvania Supreme Court noted

the great responsibility that courts have to protect attorney-client relationships. See Adler Barish,

393 A.2d at 1185 (holding that the court's interest in "regulating lawyers is especially great" and

"[o]ur 'special responsibility' includes the obligation to assure that persons seeking professional

legal assistance receive the quality advocacy and fair treatment they justifiably expect"). Like the

courts in Shein and Adler Barish both found, it is in the public interest to ensure that clients are

given the proper information to permit them to make informed decisions regarding their

representation. As the court in Adler Barish put it, no public interest will be served in permitting

Seithel to benefit from "a client[']s immediate, perhaps ill considered, response to the

circumstances." Adler Barish, 393 A.2d at 1181. When departing attorneys use confidential client

information to solicit clients through misleading communications, "clients may too easily suffer

in the end." Id. at 1185. And there is certainly no public interest served in permitting a lawyer to

participate in conduct which violates the Rules of Professional Conduct. Although Defendants

argue that injunctive relief is actually contrary to the public interest because it would take away

clients' essential right to the freedom to choose their own counsel, the Court believes that

injunctive relief will have just the opposite effect. That is, the misleading communications that

Seithel made to Feldman & Pinto clients are what eliminated their ability to make an informed

decision regarding their representation. Similar to Shein and Adler Barish, Seithel's communications with clients posed too great of a risk of undue influence on unsophisticated clients. By issuing injunctive relief, the Court would merely be restoring the clients' right to choose. Therefore, the fourth prong of the preliminary injunction analysis also weighs in favor of Plaintiff.

### E.     Unclean Hands

Defendants are not entitled to an unclean hands defense. To establish unclean hands the defendant must show: "(1) that the party seeking relief engaged in conduct involving fraud, deceit, unconscionability, or bad faith; (2) that such conduct is directly related to the matter at issue before the court; (3) that the conduct injures the other party; and (4) that the conduct affects the balance of equities between the litigants." RCN Telecom Servs., Inc. v. DeLuca Enters., Inc., 413 F. Supp. 2d 464, 475 (E.D. Pa. 2005). Defendants' argument that Plaintiff acted with unclean hands is premised upon the fact that Plaintiff made efforts to communicate with clients, mainly via Bouyeh Zulu and Bradley McDermott, in ways which disparaged Seithel and persuaded clients to retract a freely made election.

Plaintiff did not act with unclean hands. The Court agrees with Plaintiff's expert, Wilkinson, that Plaintiff's response to Seithel's letters was reasonable given the circumstances. As Wilkinson testified, when a departing lawyer does not communicate with its old firm regarding her intent to solicit firm clients, the firm's "corrective disclosures and corrective speech can be appropriate in reacting to what [the firm] perceive[s] to be misleading speech." (Tr. 10/26/11, 242:1-7). The letters and e-mails that McDermott and Zulu sent were the firm's

attempt to clear up the confusion caused by Seithel's decision to contact Feldman & Pinto clients without first notifying Feldman & Pinto. Such communications were not very different than the communications sent out by the plaintiff in <u>Shein</u>, which described, in detail, the defendants' attempt to remove client files and the plaintiff's filing of an action against the defendants in the Philadelphia Court of Common Pleas. <u>See</u> <u>Shein</u>, 576 A.2d at 560. The plaintiff in <u>Shein</u> sent the communications in an attempt to assure clients that their cases remained in good care. <u>Id.</u>  In communicating with the clients that elected Seithel, Plaintiff was attempting to remedy the clients' confusion by providing an explanation as to the events that had transpired – Seithel sent a letter to clients containing misleading statements in an attempt to solicit business for her firm. Although the story may be unflattering for Seithel, as the Court has found in this Opinion, it was the only story Plaintiff could tell. Plaintiff's conduct was reasonable, and there was nothing contained in these communications that was so egregious as to qualify as unconscionable, fraudulent or in bad faith. Therefore, Defendants' unclean hands defense must fail.

## V.      CONCLUSION

For the reasons set forth above, the Court will grant Plaintiff's Motion for Preliminary Injunction. An appropriate Order follows.